## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN DOES 1-8,<br>Addresses Withheld,<br><br>    *Plaintiffs*,<br><br> v.<br><br>BOY SCOUTS OF AMERICA, a<br>congressionally chartered corporation<br>domiciled in the District of Columbia,<br>1325 W. Walnut Hill Lane, Irving, TX 75038,<br><br><br>    *Defendant*. | Case No.<br><br>Plaintiffs demand a jury trial |

## <u>COMPLAINT</u>

Plaintiffs JOHN DOES 1-8 ("Plaintiffs"),[1] by counsel, hereby state and allege as follows:

### NATURE OF ACTION

1.  This is a diversity action to hold Defendant THE BOY SCOUTS OF AMERICA ("BSA") accountable for failing to protect Plaintiffs and other boys across the country from rampant sexual abuse at the hands of BSA scoutmasters and other scout leaders, and to provide a forum in Washington, D.C., for Plaintiffs and other abused scouts to assert claims and receive some measure of justice for the horrific abuse they suffered.

2.  Plaintiffs were each sexually abused as minors by a BSA scoutmaster or scout leader. Plaintiffs were as young as eight years old when they were abused by a BSA scoutmaster or scout leader, either in connection with a Scouting activity or in related attacks. Plaintiffs have suffered severe and life-long injuries from the abuse.

---

[1] As victims of child sex abuse, Plaintiffs are referred to as John Does to protect their identities. A motion to use pseudonyms has been submitted concurrently with this Complaint.

3.      BSA, by its acts, failures, misrepresentations, and omissions, was directly responsible for, and enabled, the abuse of Plaintiffs and countless other scouts. BSA created, maintained, and promoted programs that attracted pedophiles by the tens of thousands and gave these predators unsupervised access, and therefore opportunities, to prey on boys who had been entrusted to BSA's custody and care. BSA's programs were tailor-made for pedophiles to forge trusting relationships with boys of their desired age ranges, exploit their positions of authority and control over the boys to commit horrific acts of sexual abuse, and discourage boys from reporting that abuse by enforcing BSA's core values of obedience and loyalty to scout leaders.

4.      BSA consistently misrepresented itself as a safe, wholesome, values-based organization where scouts would be "prepared for life," when BSA knew, in fact, that: its programs were infested with pedophiles; its organization-wide abuse problem dated back to the 1910s; and the rampant abuse in its programs was doing serious harm to thousands of boys. Yet BSA hid these critical facts from Congress, the American public, scouts, and their parents, all while inducing generations of boys to participate in its pedophile-infested programs.

5.      As a youth-serving organization, BSA owed the highest duty to Plaintiffs and the other children entrusted to its care and custody. But it failed these vulnerable children, who will bear the scars of abuse for their lifetimes.

6.      Plaintiffs allege claims for negligence; negligent selection, training, supervision and retention; negligence in failing to provide a reasonably safe place for scouting activities and instead exposing scouts to the known dangerous condition of pedophiles and abuse; breach of fiduciary duty, based on BSA's special relationship with these children, including that scouts were entrusted to BSA's custody and care; and negligent and fraudulent misrepresentation, by falsely promoting itself and its programs as safe, without disclosing the most material of

2

information—namely, that the organization was a magnet for pedophiles and that scouts were exposed to these predators and faced a substantially increased risk of abuse by participating in its programs. Plaintiffs seek compensatory and punitive damages.

7.     BSA has known since shortly after its inception in 1910 that its programs were especially susceptible to widespread child sex abuse. Over the decades, BSA secretly collected tens of thousands of confidential files on pedophilic scoutmasters and scout leaders. BSA secretly destroyed an unknown number of these files as part of its efforts to conceal its legacy of abuse and to promote and maintain its false image as a safe, wholesome, values-based organization. Fortunately, BSA did not succeed in destroying all of these files. Some remain as evidence of the history of predation in Scouting and BSA's knowledge of the widespread problem.

8.     Plaintiffs were all abused in states other than Washington, D.C. Under the statutes of limitations in those other states, Plaintiffs' claims against their abusers and other local individuals and entities may be time-barred.[2] However, under Washington, D.C.'s recently effective "window statute" (D.C. Law 22-311), Plaintiffs' claims against BSA are timely.[3] Washington, D.C., has a significant interest in applying its law to Plaintiffs' claims against BSA. BSA is a corporation chartered by Congress, BSA was founded here, BSA is domiciled here as a matter of law, and conduct relevant to this case, including BSA's statutorily required annual reports to Congress, occurred here. Further, as indicated by its enactment of the window statute, Washington, D.C., has an interest in providing justice to severely abused individuals, including

---

[2] The statutes of limitations in those jurisdictions may have been tolled—namely, did not run—because of fraudulent concealment or another reason. Plaintiffs do not concede that their claims against their abusers and local entities would be time-barred.

[3] Because the D.C. choice-of-law rules treat statutes of limitations as procedural, they "almost always mandate application of the District's own statute of limitations." *A.I. Trade Fin., Inc. v. Petra Int'l Banking Corp.*, 62 F.3d 1454, 1458 (D.C. Cir. 1995).

Plaintiffs. Plaintiffs should not be denied a remedy by the happenstance that they were abused as a child by a BSA scout leader in a state without a window statute. By applying Washington, D.C.'s statute of limitations to Plaintiffs' claims against BSA, this Court will remedy the clear injustice that would result from Plaintiffs having no redress simply because of where they were abused as a child.

9.     This action, if successful, would not only provide important compensation to Plaintiffs, but also would provide a pathway and forum for other scouts from across the country to obtain a measure of justice for the horrendous abuse they suffered. It would also call out BSA's century of egregious misconduct, and if punitive damages are awarded, could deter further misconduct and protect future generations of scouts from the horrors suffered by Plaintiffs and so many others.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332, because this controversy is between citizens of different states and the amount in controversy for each of the Plaintiffs exceeds $75,000, exclusive of interest and costs. This court also has a second, independent basis for subject matter jurisdiction pursuant to 36 U.S.C. § 30904, which provides that BSA may sue and be sued in the courts of the United States.

11.     This Court has personal jurisdiction over BSA because BSA "is a body corporate and politic of the District of Columbia" whose legal domicile is in the District of Columbia, 36 U.S.C. § 30901, and because substantial acts and omissions occurred in the District of Columbia.

12.     Venue is proper under 28 U.S.C. § 1391(b)(1) & (2), because BSA resides in the District of Columbia pursuant to 28 U.S.C § 1391(c)(2), and because substantial acts and omissions occurred in the District of Columbia.

## PARTIES

13.     Due to the nature of the allegations, this Complaint uses pseudonyms to protect the identities of the Plaintiffs.

14.     Plaintiffs are domiciled in, and are citizens of, various states from across the country. None is domiciled in or a citizen of the District of Columbia.

15.     Each Plaintiff asserts claims for the recovery of damages arising out of sexual abuse that occurred when he was less than 35 years of age.

16.     Each Plaintiff is less than 40 years old.

17.     Plaintiff Doe 1 resides in Hawaii. He was a member of Troop 191, based out of Lake Dallas, Texas. He was approximately 11 to 16 years old when he was sexually abused by a BSA assistant scout leader. He is now 39 years old.

18.     Plaintiff Doe 2 resides in Virginia. He was a member of Troop 224, which was based out of a local LDS church in Morganton, North Carolina. He was 11 to 14 years old when he was sexually abused by a BSA scout leader. He is now 39 years old.

19.     Plaintiff Doe 3 resides in West Virginia. He was a member of a BSA troop in Alderson, West Virginia in 1994. He was 10 years old when he was sexually abused by a BSA scout leader. He is now 36 years old.

20.     Plaintiff Doe 4 resides in Colorado. He was a member of Troop 307, which was sponsored by Holy Faith Catholic Church in Gainesville, Florida. He was 11 to 14 years old when he was sexually abused by a BSA assistant scoutmaster. He is now 38 years old.

21.     Plaintiff Doe 5 resides in Arkansas. He was a member of a BSA troop sponsored by Our Lady of the Holy Souls Catholic Church in Little Rock, Arkansas. He was approximately 9 to 12 years old when he was sexually abused by a BSA scoutmaster. He is now 32 years old.

22.     Plaintiff Doe 6 resides in Kentucky. He was a member of Troop 87, which was based out of the Sunny Lane United Methodist Church in Del City, Oklahoma. He was 12 years old when he was sexually abused by a BSA scout leader. He is now 34 years old.

23.     Plaintiff Doe 7 resides in Utah. He was a member of Troop 777, which was based out of a local LDS church in Kearns, Utah. He was approximately 8 to 16 years old when he was sexually abused by a BSA scout leader. He is now 35 years old.

24.     Plaintiff Doe 8 resides in Arizona. He was a member of a BSA troop based out of Nellis Air Force Base in Las Vegas, Nevada. He was approximately 9 to 11 years old when he was sexually abused by a BSA scout leader. He is now 35 years old.

25.     Defendant Boy Scouts of America is a federally chartered corporation, whose corporate charter (codified at 36 U.S.C. § 30901, *et seq.*) establishes BSA as a domiciliary and "body corporate and politic of" the District of Columbia.

## STATEMENT OF FACTS

### A.     BSA Was Founded in Washington, D.C., Is a Federally Chartered Corporation, and Is Required by Law to Report to Congress.

26.     BSA was founded and incorporated in Washington, D.C., in 1910. Its founding documents proclaimed a mission to "organize the boys of the District of Columbia and elsewhere in the United States, into units, and to teach them, . . . through duly assigned leaders, discipline, patriotism, courage, habits of observation and self-control, and ability to care for themselves in all exigencies of life."

27.     Congress and President Woodrow Wilson granted BSA a federal charter in 1916, now codified as Chapter 309 of Title 36 of the U.S. Code. The charter recognized that BSA is a "body corporate and politic of the District of Columbia," with a mission to teach boys "patriotism, courage, self-reliance, and kindred virtues." 36 U.S.C. §§ 30901-02.

28.     The charter requires BSA to submit an annual report to Congress on the activities of the corporation. 36 U.S.C. § 30908. For 103 years, BSA representatives have traveled to Washington, D.C., to deliver BSA's "Report to the Nation."

**B.      BSA Has Made Hundreds of Millions of Dollars by Marketing Itself as a Safe and Moral Organization for Boys.**

29.     Since its founding, BSA has operated as a commercial enterprise that makes sophisticated use of powerful American symbols and advertising techniques to sell its brand of moral rectitude to the public and attract boys to join its troops. To this day, BSA markets itself as "the nation's foremost program of character development, outdoor adventure, and values-based leadership."

30.     BSA's campaign to promote a wholesome image has worked: More than 110 million American boys have been members of the BSA at some point in their lives. BSA currently has 1.8 million youth participants.

31.     BSA is funded by membership dues, private donations, corporate sponsors, and special events. In 2018, BSA generated more than $285 million in total revenue.

32.     BSA pays its executives handsomely. In 2007, BSA paid its Chief Executive $1.6 million dollars—making him the highest paid human services CEO in the country, and one who earned at least four times the compensation of his counterpart at the Girl Scouts of America.

33.     BSA owns land across the United States, where it hosts BSA camps and other BSA activities.

34.     BSA maintains a collection of artifacts and fine art valued in excess of $80 million.

35.     Congress gave BSA the exclusive right to use the BSA name, emblems, badges, and descriptive words and markings. 36 U.S.C. § 30905. BSA derives income from licensing its name, emblems, and BSA-branded merchandise throughout the United States.

36.     For decades, BSA has received other special benefits from the federal government, including free access to national forest lands, 16 U.S.C. § 539f; free use of Defense Department equipment and facilities for BSA Jamborees, which are large BSA gatherings for scouts and leaders, 10 U.S.C. § 2554; free ground and air transportation, communications, and emergency and technical services from the National Guard, 32 U.S.C. § 508; free facilities, transportation, and support services at U.S. military bases world-wide, 10 U.S.C. § 2606; free firearms, ammunition, repairs, supplies, and marksmanship training equipment, 36 U.S.C. § 40731; special access to military surplus materials, 10 U.S.C. Ch. 973; and special access to Department of Agriculture grants, 7 U.S.C. § 7630. In 2010, the U.S. Treasury minted commemorative silver dollar coins to commemorate the 100-year anniversary of BSA, with a portion of proceeds directed to a foundation that provides grants to local BSA councils.

37.     The Congressional Research Service has recognized the benefits to organizations like BSA of being congressionally chartered: "it tends to provide an 'official' imprimatur to their activities, and to that extent it may provide them prestige and indirect financial benefit." BSA has exploited the federal government's continued approval and support of BSA to perpetuate an image of legitimacy and safety to parents considering entrusting their young boys to the care, guidance, and instruction of BSA.

C.      **BSA Has Long Known About, and Hidden from the Public, Rampant Child Sexual Abuse within the Organization.**

38.     To protect its wholesome image, its imprimatur of government support, and its bottom line, BSA has fraudulently concealed from Congress, the American public, and potential

scouts (including Plaintiffs) and their parents, its actual knowledge that pedophiles have been drawn to and participated in its Scouting programs in staggering numbers.

39.     As a matter of BSA policy and practice, adults seeking to participate in BSA's programs as scout leaders must submit applications to BSA or otherwise obtain BSA's approval.

40.     BSA's corporate bylaws state that "[n]o person shall be approved as a . . . leader unless, in the judgment of the [BSA], that person possesses and demonstrates the moral, educational, and emotional qualities deemed necessary for leadership . . . ." A nearly identical provision has appeared in the BSA bylaws since before the abuse at issue.

41.     Despite the standards in its bylaws and the requirement of BSA approval for its Scouting leaders, BSA has known for at least ninety years that it has regularly allowed pedophiles to become BSA leaders.

42.     Soon after its founding, BSA began secretly collecting "Ineligible Volunteer" files (hereinafter "the I.V. files," and commonly referred to in the news media as "the perversion files").

43.     By 1935, BSA had accumulated over 2,900 such confidential files on scout leaders who were dismissed from Scouting with cause, a substantial number of which were pedophiles.

44.     In a 1935 *New York Times* article, BSA's Chief Scout Executive acknowledged the existence of the I.V. files (known at the time as the "red-flag list") and BSA's knowledge of sexual abuse by BSA leaders. He stated: "We have had some very depressing and sad experiences over the years. We still have those who seek to enter Scouting and contact boys who are unbalanced morally and then again we have those who are soundly balanced, but who . . . by reason of psychological and . . . pathological sequences, when they get into boys' work,

undertake to deal with sex matters and become morbid on the subject and sometimes give way to temptation and develop practices which make them degenerates."

45.     BSA's rare acknowledgement of the existence of the I.V. files was not made to protect the public from known pedophiles—whose identities remained shrouded in secrecy—but rather to allay public concerns that the "red flag" files identified Communists within the group. Indeed, the Chief Scout Executive dismissed the scope of the problem of sexual abuse in Scouting as "not very alarming."

46.     In the following decades, as it grew to become the largest youth-serving group in the United States, BSA continued to secretively amass alarming numbers of I.V. files.

47.     In the 1970s, BSA spent three years shredding I.V. files.

48.     The actual number of I.V. files that the BSA destroyed is unknown, but it is believed that BSA destroyed tens of thousands of files.

49.     BSA maintained no contemporaneous logs recording which or how many of the files it destroyed.

50.     BSA made no record of the criteria it applied in deciding which files to destroy.

51.     BSA maintains I.V. files to this day.

52.     BSA continues to keep its I.V. files confidential, except when ordered released by a court.

53.     Despite BSA's efforts to shield the existence and contents of the I.V. files, beginning in the 1990s BSA was required by court orders to release certain of the files.

54.     BSA has fought disclosure of the true number of files and has released the bare minimum in each case it has litigated, resulting in an incomplete picture of the scope and scale of organization-wide abuse.

55.     In 2012, *The Los Angeles Times* published a database of about 5,000 I.V. files related to sexual abuse. The database was comprised of previously confidential I.V. files that (1) survived the BSA file purge, and (2) were released as evidence in a court case.

56.     According to public media statements, BSA now has roughly 8,000 I.V. files in its possession.

57.     BSA continues to hide these files from the public, consistent with its approach to sexual abuse in Scouting for over a century.

58.     The publicly released I.V. files confirm that BSA has long been a magnet and sanctuary for pedophiles. In addition to revealing the identities of pedophiles in BSA's ranks, the files show how the unique characteristics of BSA's Scouting programs leave children particularly exposed to abuse by pedophilic BSA leaders, and reveal the wealth of information that BSA had about the techniques, grooming patterns, and particular biographical and behavioral characteristics of pedophiles within BSA.

59.     The limited set of I.V. files that are now public show that BSA had overwhelming evidence that Scouting attracts large numbers of pedophiles and the reasons why:

   a)  Scouting provides pedophiles access to boys and the ability for pedophiles to isolate boys from their parents during activities in secluded settings like campouts and overnight hikes;

   b)  Scouting provides opportunities for pedophiles to molest boys by putting them in situations where boys change clothing and sleep in close proximity to, and within access of, the pedophile;

   c)  A pedophile scout leader can volunteer to work with and be sure to have access to boys of the age that the pedophile prefers;

11

d)  BSA conditions boys to adhere to the practice of strict obedience to the Scout Leader, and encourages an environment of male bonding that that pedophiles crave and can exploit;

e)  BSA promotes the ideas of secret ceremonies, rituals, and loyalty oaths, all of which help facilitate a pedophile's efforts to keep victims silent and compliant;

f)  The Scout Oath requires that scouts obey the Scout Law;

g)  The Scout Law, among other things, requires scouts to be Obedient and Loyal, in part by "show[ing] that you care about your . . . Scout leaders";

h)  At the time of the abuse at issue in this litigation, BSA did not photograph, fingerprint, or conduct background checks on its adult volunteers;

i)  At the time of the abuse at issue in this litigation, BSA had no policies regarding adults sleeping in tents with boys;

j)  At the time of abuse at issue in this litigation, BSA had no policies prohibiting individual adult leaders from spending time alone with scouts;

k)  At the time of the abuse at issue in this litigation, BSA had no policies prohibiting adult scout leaders from having contact with individual scouts outside of regular Scouting activities;

l)  BSA's historical pattern and practice was to not report child sexual abuse to the police, but instead to allow the pedophile to quietly resign in exchange for keeping the abuse secret from parents and state authorities;

m)  BSA, upon learning of an incident of sexual abuse of a scout, did not report the abuse to law enforcement or to other state agencies charged with the protection of children, thereby keeping other children in the community at risk;

n)  BSA did not investigate whether scout leaders who were known pedophiles abused other boys in Scouting;

o)  BSA did not warn parents of scouts who BSA knew or should have known came into contact with the abuser;

p)  BSA had a policy to re-admit known pedophiles to Scouting after a period of "probation";

q)  BSA refused and continues to refuse to share the I.V. files or other information regarding known pedophiles in BSA with other youth organizations, despite knowing that pedophiles frequently seek entry into other youth organizations if they are removed from BSA;

r)  BSA failed and refused to make use of the data contained in the I.V. files to develop and implement effective safeguards and barriers to participation in its program by pedophiles;

s)  BSA failed to utilize organizational best practices that would establish reasonable barriers to entry by pedophiles; and

t)  BSA failed to properly monitor local BSA councils and troops to ensure that appropriate safeguards were being used in the selection and retention of adult scout leaders.

60.  Despite paying out tens of millions of dollars in settlements and verdicts arising from sexual abuse of scouts by pedophile scout leaders, BSA continues to deliberately make false and misleading statements regarding the true risks of sexual abuse in Scouting; continues to minimize the harm of sexual abuse to children; fails to provide support and assistance to boys (including boys who are now adults) who BSA knows were sexually abused by scout leaders;

and continues to deny the truth about its historical knowledge of the nature and extent of BSA's pedophile problem.

61.    BSA still fails to prevent pedophiles from entering its programs.

62.    BSA still refuses to provide scouts and their parents with meaningful information about pedophiles and their methods, which would help protect children from sexual abuse by scout leaders.

63.    BSA still fails to adequately investigate claims of sexual abuse by scout leaders and to inform scouts' parents, guardians, and caretakers.

64.    All eight Plaintiffs in this lawsuit allege abuse by individuals who have not been identified in the publicly-released, surviving I.V. files.

65.    Plaintiffs constitute a cross-section of former scouts from across the country. Their experiences indicate that the publicly-released, surviving I.V. files represent a tiny fraction of child sexual abuse in BSA.

66.    Many survivors of child sexual abuse never come forward; others do so much later in life.

67.    Taking into account the existing I.V. files, the known destruction of thousands of other I.V. files, BSA's historic dishonesty regarding the scope of the problem of sexual abuse in Scouting, the fact that scores of abused scouts have come forward whose abusers were not previously publicly identified, and the reluctance of sexual abuse victims to come forward at all, a conservative estimate is that at least 75,000 pedophile scout leaders have targeted and abused boys during or in connection with BSA-sponsored activities.

68.    According to the FBI Behavioral Research division, pedophiles can abuse hundreds of victims over a lifetime.

69.    It is very common for boys abused in Scouting to know, or know of facts that strongly suggest, that other boys in their troop were abused by the same scout leader. Some Plaintiffs know, or know facts that cause them to believe, that the scout leaders who abused them also abused other troop-mates.

70.    Given the foregoing facts, hundreds of thousands of (if not over one million) boys have been abused by BSA scout leaders in connection with Scouting-related activities.

71.    Every year, BSA sends a handpicked delegation of scouts to deliver its Report to the Nation to the Speaker of the U.S. House of Representatives in Washington, D.C. According to BSA's website: "This report is a presentation of who we are and what we do as a community."

72.    However, not once in 103 years of reporting to Congress has BSA disclosed the fact that its programs were, and are, magnets to tens of thousands of pedophiles and that hundreds of thousands of scouts have suffered sexual abuse during and in connection with BSA activities.

73.    Instead, BSA's Reports to the Nation have miscast the organization as a bastion of moral authority and ethical, lawful conduct—and knowingly misrepresented that BSA embodies the values that it purports to instill in scouts. For example:

a)  In 1992, BSA reported to the nation that it had "effective methods of delivering a strong, values-based program to meet the needs of youth," but failed to disclose that its BSA scout leader ranks have contained tens of thousands of pedophiles abusing boys and injuring them for life under the cloak of that program.

b)  In 2000, BSA claimed that "Scouting is a values-based program designed to instill . . . self-confidence . . . and self-worth—qualities that last a lifetime." In fact, the sexual abuse suffered in BSA robbed Plaintiffs and hundreds of thousands of other

15

abused boys of self-confidence or feelings of self-worth. BSA also claimed hypocritically that it remained steadfast in its ability to uphold values "[i]n a time of declining ethics and shifting morals," not revealing its extensive knowledge of BSA's unethical, immoral, and illegal failure to protect scouts from sexual abuse by BSA scoutmasters and leaders—the very people, BSA told the nation, parents should entrust to teach their children lifelong values.

c)   And in 2010, BSA stated that it "prepares young people to make ethical and moral choices over their lifetimes by instilling in them the values of the Scout Oath and Scout Law," but did not disclose its own failure to act with "integrity" or to engage in "ethical decision making" through its failures to prevent rampant sexual abuse in BSA, and its efforts to cover up the extensive evidence in its files documenting that abuse.

74.   BSA has used its Reports to the Nation to bolster its image and standing among the American people, and as a component of its broader recruitment and self-promotion activities. Reports to the Nation are shared with the public as part of the Congressional Record; broadcast as promotional material to scouts, potential scouts, and their families on the BSA website; and sent to scouts and their families as part of BSA's official publication, Scouting Magazine.

75.   BSA encourages scouts and their families to read and share its Reports to the Nation "as a placard to showcase our accomplishments and our continued relevance in today's society." As BSA stated in the January-February 2013 edition of Scouting Magazine: "With the Report to the Nation in hand, you have a relevant and timely opportunity to get in front of media, elected officials, current and potential donors, council board members, schools, and others to show why Scouting matters."

76.     BSA never disclosed in its Reports to the Nation what it knew to be true: that tens of thousands of BSA's own leaders—the scoutmasters and assistant scoutmasters that were allegedly teaching values and skills to last a lifetime—were in fact preying on hundreds of thousands of boys, including Plaintiffs. In fact, these sexual predators took advantage of the values promoted in the Scout Law, including "trustworthiness," "loyalty," and "obedience," to exercise control over young boys, sexually abuse them, and manipulate them into staying quiet.

77.     BSA knew, but never disclosed to Congress or the American public, the facts demonstrating the extent to which its conduct violated reasonable standards of care—not to mention its self-exalted Scout Law:

a)  BSA was not trustworthy. It broke its most basic promise to boys—that they would be safe in the care of BSA leaders.

b)  BSA was not kind. It allowed BSA troops to be infested by pedophiles who sexually abused innocent boys, harming them for life.

c)  BSA was not brave. Rather than publicly acknowledging, confronting, and aggressively rooting out the problem of sexual abuse infecting the organization, it stayed silent, destroying thousands of I.V. files and hiding the rest.

d)  BSA was not loyal to those to whom it owed the highest obligations of care and protection—the scouts themselves. Instead, BSA abandoned them to be abused by BSA leaders. BSA was loyal only to its organizational self-interest.

**D.     BSA Assisted, Enabled, and Was Complicit in the Sexual Abuse of Plaintiffs.**

Doe 1

78.     Plaintiff Doe 1 lives in Honolulu, Hawaii. He is a BSA child sex abuse victim and survivor.

17

79.     At the time of the abuse, Doe 1 was a minor, resident of Texas, and a member of Troop 191, which was based out of Lake Dallas, Texas.

80.     Beginning in or around 1991, when Plaintiff was 11 years old, he was sexually abused by Anthony "Tony" Lee Fruzia, a BSA assistant scout leader, for approximately five years.

81.     Doe 1 was abused on 20 to 30 occasions.

82.     The abuse occurred during BSA events at campsites at Wichita Mountains Wildlife Refuge in Oklahoma, on mountain climbing trips, on a road trip to monuments and national parks in Colorado and Wyoming, including Royal Gorge and Rocky Mountain National Park, and on a few instances at the assailant's apartment in The Colony, Texas.

83.     Each instance of sexual abuse involved anal penetration of Doe 1. Some instances also involved oral copulation and masturbation.

84.     Doe 1 believes that Fruzia was abusing at least one other troop member while he was abusing Doe 1. That troop member told Doe 1 about the abuse and Fruzia talked about the other boy's penis while abusing Doe 1.

85.     Fruzia's abuse of Doe 1 was apparent to another adult around the troop. That adult, who now appears on the national sex offender registry himself, asked Doe 1 if Fruzia had been touching him inappropriately.

86.     Toward the end of Fruzia's abuse of Doe 1, Fruzia told Doe 1 that Fruzia would connect Doe 1 with other adults who would pay to have sex with him, thus attempting to use his position of trust and authority within BSA to prostitute out Doe 1 to other pedophiles.

87.     Doe 1 believes that Fruzia also proposed prostitution to the other boy he was abusing.

88.     Doe 1 rejected Fruzia's prostitution scheme and quit Scouting shortly thereafter.

89.     Doe 1 has served in the U.S. Navy for over 18 years. In 2003, he was reduced in military rank as a result of a substance abuse disorder that he had acquired as a direct result and reasonably probable consequence of the abuse.

90.     In 2010, Doe 1 experienced a psychological breakdown around the time his son asked to join BSA. Although Doe 1 had told other family members of his own abuse, he had not told his minor son.

91.     Doe 1 has suffered (and will continue to suffer) physical and/or mental injury, pain, and suffering in the form of depression, anxiety, social disorders, substance abuse, low self-esteem, distrust of others, employment-related issues, emotional trauma, sleeping problems, and other injury, harm, and economic damages.

92.     BSA's acts, failures to act, misrepresentations and omissions played a substantial part in causing Doe 1's injuries.

Doe 2

93.     Plaintiff Doe 2 lives in Virginia. Doe 2 is a BSA child sex abuse victim and survivor.

94.     At the time of the abuse, Doe 2 was a minor, resident of North Carolina, and member of Troop 224, which was based out of a local LDS church in Morganton, North Carolina.

95.     Beginning in or around 1992, when Plaintiff was 11, he was sexually abused by Paul Iwaniec, a BSA assistant scoutmaster, for approximately two years.

96.     Iwaniec became a BSA leader through his membership in the Mormon church. Iwaniec was also Doe 2's stepfather.

97.     The assistant scoutmaster abused Doe 2 during Scouting activities at overnight campouts, the LDS church, and other locations in Morganton and throughout North Carolina.

98.     On a daily or near-daily basis, the assistant scoutmaster forced Doe 2 to engage in a range of sexual activity, including oral and anal sex.

99.     Iwaniec isolated Doe 2 from the troop during Scouting activities, including removing him from his tent in the middle of the night at campouts and pulling him into the woods at Scouting activities.

100.    The abuser awarded merit badges to Doe 2 for performing sexual acts.

101.    BSA leaders suspected that Iwaniec was abusing Doe 2, but Iwaniec threatened Doe 2 that he would kill him or his mother if he told anyone, so Doe 2 stayed silent and BSA leaders did not further investigate.

102.    When Doe 2 finally told the Troop 224 scoutmaster about the years of abuse he suffered at the hands of Iwaniec, the scoutmaster reported the abuse to local authorities and the abuser was arrested, convicted, and sentenced to prison.

103.    Doe 2 has suffered (and will continue to suffer) physical and/or mental injury, pain, and suffering in the form of depression, anxiety, social disorders, substance abuse, low self-esteem, distrust of others, employment-related issues, emotional trauma, sleeping problems, lack of sexual desire, and other injury, harm, and economic damages.

104.    BSA's acts, failures to act, misrepresentations and omissions played a substantial part in causing Doe 2's injuries.

Doe 3

105.    Plaintiff Doe 3 lives in Alderson, West Virginia. He is a BSA child sex abuse victim and survivor.

106.    At the time of the abuse, Doe 3 was a minor, resident of West Virginia, and a member of a BSA troop in Alderson, West Virginia. The number of his troop and the troop's sponsoring organization are currently unknown.

107.    Beginning in 1994, when Doe 3 was 10 years old and new to BSA, he was sexually abused by Calvin [LNU], an adult leader of the BSA troop.

108.    Doe 3 joined the scouts because his friends were in the troop, and he was excited to experience camping and other Scouting activities.

109.    But on his very first camping trip to Blue Bend Campground in Frankford, West Virginia, Calvin encouraged Doe 3 to go swimming in the lake. When Doe 3 responded that he did not have his swimsuit, Calvin told him to get undressed and to swim naked.

110.    Calvin proceeded to touch Doe 3's genitals, and then to orally copulate with Doe 3.

111.    Because of the sexual abuse, Doe 3 left the BSA troop shortly after the abuse occurred.

112.    Doe 3 has suffered (and will continue to suffer) physical and/or mental injury, pain, and suffering. The abuse caused Doe 3 to experience problems controlling his deep anger in his teenage and early adult years, and caused a deep mistrust of male authority figures, including teachers, because of Doe 3's suspicion of their motives and intentions towards him. That anger led Doe 3 to seek physically violent outlets for his anger, including pursuing a career in mixed martial arts. In addition, Doe 3 has a nearly ten-year-old son of his own who loves to go camping at Blue Bend; however, because of the abuse Doe 3 suffered there, he does not feel comfortable going there, so his wife must visit the park alone with their son. Thus, the abuse continues to deprive Doe 3 of formative outdoor and camping experiences with his family.

113.    BSA's acts, failures to act, misrepresentations and omissions played a substantial part in causing Doe 3's injuries.

Doe 4

114.    Plaintiff Doe 4 lives in Arvada, Colorado. Doe 4 is a BSA child sex abuse victim and survivor.

115.    At the time of the abuse, Doe 4 was a minor, resident of Florida, and member of Troop 307, which was based out of Holy Faith Catholic Church in Gainesville, Florida.

116.    Beginning in 1993, when Plaintiff was 11 years old, he was sexually abused by George V. Cooper, a BSA assistant scoutmaster, for approximately three years.

117.    Cooper abused Doe 4 on at least seven occasions. The abuse occurred on BSA camping trips to Camp Shands in Melrose, Florida, and to the Suwannee River, in Cooper's home during sleepovers he hosted for troop members, and in Cooper's truck.

118.    Cooper's abuse progressed from extensive physical contact, such as backrubs, to explicit sexual conversations, and then to touching and rubbing Doe 4's genitals.

119.    On multiple occasions, both at Camp Shands and on a scout trip to the Suwannee River, Cooper entered Doe 4's one-person tent while Doe 4 was sleeping, and Doe 4 awoke in the early morning to Cooper fondling and masturbating him.

120.    Cooper pressured Doe 4 not to tell anyone about these incidents, explaining that Doe 4 would not want Cooper to get in trouble for something that, Cooper said, was not even wrong, and urged him not to talk to others about what happened on the BSA camping trips.

121.    On numerous occasions, Cooper hosted sleepover parties for five to ten boys, at which he played pornographic videos and let the boys, in groups of two or three, enter his bedroom to look at pornographic magazines.

22

122.    On at least one occasion when Doe 4 was in the bedroom with other boys, Cooper sent the other boys out of the bedroom, and sexually abused Doe 4.

123.    At other sleepovers, Doe 4 witnessed all boys except for one exit the bedroom, leaving one boy in the bedroom alone with Cooper.

124.    When Doe 4 refused to allow Cooper to continue to abuse him when Doe 4 was 14 years old, Cooper caused him to become rejected by and alienated from the boys who had been friends in the troop.

125.    Cooper was later arrested and convicted of lewd behavior and is currently a registered sex offender in Florida. On information and belief, his conviction resulted from actions unrelated to BSA.

126.    Doe 4 has suffered (and will continue to suffer) physical and/or mental injury, pain, and suffering, including but not limited to emotional and self-confidence problems during his teens and twenties; problems with social relationships, including family relationships; and distrust of others, including those in positions of authority over him and those showing kindness toward him.

127.    BSA's acts, failures to act, misrepresentations and omissions played a substantial part in causing Doe 4's injuries.

<u>Doe 5</u>

128.    Plaintiff Doe 5 is a resident of Little Rock, Arkansas. Doe 5 is a BSA child sex abuse victim and survivor.

129.    At the time of the abuse, Doe 5 was a minor, resident of Arkansas, and member of Troop 27 sponsored by Our Lady of the Holy Souls Catholic Church in Little Rock.

130.    Beginning in or around 1995, when Doe 5 was approximately 8 years old, he was sexually abused by Tim Imhauser, the BSA scoutmaster of his troop, over a period of approximately four years.

131.    Imhauser molested Doe 5 on more than ten occasions.

132.    The abuse occurred both in the locker room of the sponsoring church after scout meetings as well as at a BSA camp in Damascus, Arkansas, then known as Cove Creek Scout Reservation.

133.    On at least ten occasions, Imhauser separated Doe 5 from the other boys and forced him to engage in sexually abusive acts, including repeated anal penetration by the scoutmaster's penis and finger, oral copulation, and fondling of Doe 5's genitals.

134.    Imhauser told Doe 5 that the BSA was a safe environment and one of trust, and that Doe 5's parents would not understand what goes on in scouts. Imhauser made Doe 5 believe that such activities were a normal part of the Scouting experience; thus, Imhauser told him, if Doe 5 had any problems about what was happening in scouts, he should talk not to his own parents, but to Imhauser, the scoutmaster.

135.    Doe 5 reported this abuse to BSA in approximately 2012. He was told, in substance, that there was nothing BSA could do. And BSA did nothing.

136.    From an officer in the Van Buren County sheriff's office, Doe 5 learned of suspicions of other potential unlawful activity concerning youth by Imhauser in Oklahoma or Northwest Arkansas.

137.    Doe 5 has suffered (and will continue to suffer) physical and/or mental injury, pain, and suffering in the form of substance abuse; distrust of others, particularly people in

positions of authority; employment-related issues; emotional trauma; difficulties with social relationships; and other injury, harm, and economic damages.

138.    BSA's acts, failures to act, misrepresentations and omissions played a substantial part in causing Doe 5's injuries.

<u>Doe 6</u>

139.    Plaintiff Doe 6 lives in Lexington, Kentucky. He is a BSA child sex abuse victim and survivor.

140.    At the time of the abuse, Doe 6 was a minor, resident of Oklahoma, and a member of Troop 87, which was based out of the Sunny Lane United Methodist Church in Del City, Oklahoma.

141.    In 1997, when Plaintiff was 12 years old, Doe 6 was sexually abused by Rick Lam, a BSA scout leader.

142.    Plaintiff Doe 6 was abused on approximately four or five occasions, each time either at Plaintiff's parents' house in Del City or at Lam's residence in Oklahoma City, Oklahoma.

143.    The abuse consisted of genital fondling and oral copulation.

144.    Lam introduced himself to Doe 6 in the Summer of 1997 at Kerr Scout Ranch at Slippery Falls in Tishomingo, Oklahoma.

145.    On information and belief, Kerr Scout Ranch is owned by BSA or a Local Council of BSA.

146.    Lam and Doe 6 had many conversations at the BSA camp.

147.    Soon after the camp, Lam transferred to, and became a scout leader of, Doe 6's Troop 87.

148.    The abuse began shortly after Lam became a Troop 87 leader.

149.    In or around September 1997, Lam was arrested and charged by Oklahoma County with indecent or lewd acts with a child under 16, at least partially related to the abuse of Doe 6. Lam pleaded *nolo contendere*, was convicted, registered as a sex offender, and sentenced to 15 years' suspended jail time.

150.    After Lam was removed, BSA never addressed the abuse with Doe 6, his parents, or Troop 87.

151.    Doe 6 has suffered (and will continue to suffer) physical and/or mental injury, pain, and suffering in the form of depression, anxiety, post-traumatic stress disorder, social and sexual disorders, substance abuse, low self-esteem, distrust of others, educational and employment-related issues, emotional trauma, sleeping problems, and other injury, harm, and economic damages.

152.    BSA's acts, failures to act, misrepresentations and omissions played a substantial part in causing Doe 6's injuries.

<u>Doe 7</u>

153.    Plaintiff Doe 7 lives in Utah. Doe 7 is a BSA child sex abuse victim and survivor.

154.    At the time of the abuse, Doe 7 was a minor, resident of Utah, and member of Troop 777, which was based out of a local LDS church in Kearns, Utah.

155.    Beginning in or around 1992, when Plaintiff was 8 years old, he was sexually abused by Kurt Nixon, a BSA scout leader, an estimated 50 times over the course of approximately eight years.

156.    Nixon served as a den leader, assistant scoutmaster, and scoutmaster throughout the time period of the abuse.

157.    While at Scouting activities, BSA overnight campouts, and Nixon's house, Nixon fondled Doe 7's genitals and forced him to have oral and anal sex. Nixon also forced Doe 7 into a bathroom to engage in sexual activities.

158.    When Doe 7 was 12 years old, he told the bishop of the Mormon ward, which was the sponsor of the BSA troop, that he did not want to participate in scouts or go on Scouting campouts because of Nixon. The prior scout leader ignored Doe 7's concerns and pushed Doe 7 to continue to participate in Scouting.

159.    The abuse continued until Doe 7 was 16 years old, when his family moved across town into a new Mormon ward.

160.    After the family moved, Doe 7's sister told Doe 7's parents about her abuse by Nixon, which prompted Doe 7 to tell his parents about his abuse.

161.    The parents contacted the Mormon bishop from the family's prior ward (of which Nixon was still a member) and told him that Nixon had sexually abused both Doe 7 and Doe 7's sister. This bishop, who had been a scout leader over Doe 7's troop while Nixon was abusing Doe 7, denied the allegations.  The bishop said he did not believe Doe 7's parents and thus by extension did not believe Doe 7.

162.    Doe 7 has suffered (and will continue to suffer) physical and/or mental injury, pain, and suffering in the form of depression, bipolar disorder, suicide attempts, substance abuse, social disorders, eating disorders, bodily pain, employment-related issues, education-related issues, dislike of physical touch, and other injury, harm, and economic damages.

163.    BSA's acts, failures to act, misrepresentations and omissions played a substantial part in causing Doe 7's injuries.

Doe 8

164.    Plaintiff Doe 8 lives in Arizona. He is a BSA child sex abuse victim and survivor.

165.    At the time of the abuse, Doe 8 was a minor, resident of Nevada, and a member of a BSA troop based out of Nellis Air Force Base in Las Vegas. The troop number is currently unknown.

166.    Beginning in or around 1993, when Plaintiff was 9 years old, he was sexually abused by Laymon McGauhey, a BSA scout leader, for approximately one to one-and-a-half years.

167.    The abuse occurred during BSA campouts, at other Scouting activities, at Doe 8's home, and in Doe 8's neighborhood in Las Vegas, Nevada.

168.    McGauhey took pictures of Doe 8 as well as other children in their underwear at BSA campouts and other Scouting activities. McGauhey was known by the nickname "Snapper" because he always had his camera with him to take pictures of children.

169.    McGauhey forced Doe 8 and other children to dress up in costumes and took pictures of them getting dressed and undressed. McGauhey also forced Doe 8 and other children to act out sexual scenes with each other while he took pictures. McGauhey forced the children to kiss each other as he sat in a chair and masturbated.

170.    McGauhey asked Doe 8 to stay overnight on multiple occasions. When Doe 8 slept over McGauhey's house, McGauhey took pictures of Doe 8 and another child together in their underwear.

171.    Doe 8 told his mother about the abuse, and she approached a scout leader with the troop. The scout leader said he did not believe that the abuse was occurring and that they did not

allow that type of thing to happen in scouts. Doe 8's parents removed Doe 8 from Scouting, and the family moved a month or two later to get out of the area.

172.     Doe 8 has suffered (and will continue to suffer) physical and/or mental injury, pain, and suffering in the form of depression, anxiety, suicidal thoughts, substance abuse, physical abuse, verbal abuse, social disorders, behavioral issues, anger issues, communication problems, learning disabilities, concentration problems, sleeping problems, psychological problems, low self-esteem, distrust of others, and other injury, harm, and economic damages.

173.     BSA's acts, failures to act, misrepresentations and omissions played a substantial part in causing Doe 8's injuries.

### STATEMENT OF CLAIMS

174.     The following claims are alleged on behalf of each Plaintiff.

### Count I
### (Negligence)

175.     Plaintiffs incorporate all paragraphs of this Complaint as if fully set forth in this count and further allege as follows.

176.     BSA owed a duty of reasonable care to Plaintiffs and other scouts to prevent, respond to, and warn of child sex abuse in its ranks; to protect scouts from abuse and foreseeable risks; and to provide a safe environment for boys participating in its youth-serving programs for several reasons, including the following:

     a)  BSA undertook and administered youth-development programs, activities, and services to minors, and as a result assumed a duty to Plaintiffs and other scouts to exercise reasonable care in connection with its programs, activities and services and as to BSA scoutmasters and scout leaders.

b) BSA had special relationships with its scouts (including Plaintiffs), and with its abusive scoutmasters and scout leaders (including Plaintiffs' abusers).

c) BSA was and is a youth-serving organization and was obligated to take reasonable steps to respond to and prevent sex abuse by its leaders.

d) Given the decades-long history of abuse in Scouting, BSA's knowledge of the abuse, and its acts to cover up the abuse, the risk to Plaintiffs and other scouts was foreseeable.

177.    BSA's duty to Plaintiffs and other scouts was heightened because they were children. BSA was obligated to exercise greater care toward Plaintiffs and other scouts than to normal adults.

178.    BSA also had a duty to Plaintiffs to control the conduct of its scoutmasters and scout leaders, given its special relationship with scoutmasters and scout leaders, knowledge that its ranks were infested with pedophiles, and the fact that child sex abuse was foreseeable.

179.    BSA breached its duty of reasonable care to Plaintiffs and other scouts by failing to take reasonable steps to prevent, respond to, and warn of child sex abuse in its ranks; failing to protect scouts from abuse and foreseeable risks; failing to provide a reasonably safe place for BSA Scouting activities; and affirmatively creating, encouraging, and maintaining an environment that attracted pedophiles, provided unsupervised access to and opportunities to abuse victims, and enabled the abuse that went unchecked for decades.

180.    BSA further breached its duty of reasonable care to Plaintiffs and other scouts by designing, promoting, and administering programs that attracted tens of thousands of pedophiles without providing adequate safeguards to protect Plaintiffs and other scouts.

181.    BSA further breached its duty of reasonable care to Plaintiffs and other scouts by affirmatively misrepresenting its programs as safe and wholesome, by concealing and disclosing the history of abuse in Scouting, and by failing to report to scouts (including Plaintiffs), parents, civil authorities, Congress, and the American public its knowledge of the risks posed to children by its programs. BSA's misrepresentations, concealments and omissions of these most material facts enabled the sexual abuse, including of Plaintiffs, to occur and continue unchecked.

182.    BSA's multiple breaches of duty, acts, failures, misrepresentations and omissions enabled and were substantial contributing causes of Plaintiffs' abuse. They caused Plaintiffs' injuries because they played a substantial part in bringing about harm to Plaintiffs.

183.    As a direct result and/or reasonably probable consequence of BSA's breaches of duty, acts, and omissions, Plaintiffs have sustained in the past, continue to sustain, and will sustain into the future, damages including:

a)   extreme pain and suffering, both physical and mental;

b)   bills and expenses for medical care and mental health counseling;

c)   diminution in the ability and capacity to work, earn money, and perform household tasks; and

d)   loss of enjoyment of life.

### Count II
### (Negligence – Failure to Provide a Safe Place and Existence of a Known Dangerous Condition)

184.    Plaintiffs incorporate all paragraphs of this Complaint as if fully set forth under this count and further allege as follows.

185.    BSA had a duty to exercise reasonable care for the protection of Plaintiffs and all other boys involved in BSA-related activities and interactions with BSA scoutmasters and scout leaders.

31

186.    BSA had a duty to provide a reasonably safe place and reasonably safe environment for Scouting activities and interactions with its scoutmasters and scout leaders.

187.    BSA was on notice since shortly after its inception that its programs attracted pedophiles in large numbers, that its troops were infested with pedophiles and abusers, and that scouts were being abused in startling numbers and were at substantial risk of being abused.

188.    BSA was on notice and had actual knowledge—from its I.V. files and from other reports and sources of information—of thousands of prior incidents of serious sexual abuse of boys by BSA scout leaders during and in connection with BSA activities, including BSA-owned camps, BSA troop meetings, camping trips, and other outings.

189.    BSA was on notice and had actual knowledge of an extremely dangerous condition: sexual abuse of scouts by adult BSA scoutmasters and scout leaders during and in connection with BSA activities and in interactions with scoutmasters and scout leaders.

190.    BSA had a higher duty, and was required to exercise greater care, in providing a reasonably safe place for Scouting activities, and for eliminating, protecting against and/or warning of the known dangerous condition of abuse, because scouts were children.

191.    BSA failed to take reasonable steps to protect against the known dangerous condition of abuse in Scouting. It also failed, as a result, to provide Plaintiffs and other scouts with a reasonably safe place for BSA activities and interactions with BSA scoutmasters and scout leaders.

192.    Plaintiffs were gravely injured by the dangerous condition about which BSA was on notice and had actual knowledge and by BSA's resultant failure to provide a reasonably safe place for BSA activities.

193.    The sexual abuse of Plaintiffs by BSA scoutmasters and scout leaders occurred during and in connection with BSA activities, including BSA-owned camps, troop meetings, camping trips, and other outings—and thus occurred in circumstances identical or substantially similar to the circumstances of the dangerous condition about which BSA had notice and actual knowledge.

194.    BSA's failures to take reasonable steps to protect Plaintiffs from this dangerous condition and to provide a reasonably safe place/environment for Scouting activities and interactions with BSA scoutmasters and scout leaders caused Plaintiffs' injuries because those failures were substantial contributing causes of Plaintiffs' injuries and played a substantial part in bringing about the harms to Plaintiffs.

195.    As a direct result and/or a reasonably probable consequence of BSA's failure to protect Plaintiffs from the dangerous condition or to provide a reasonably safe place/environment for Scouting activities and interactions with scoutmasters and scout leaders, Plaintiffs have sustained in the past, continue to sustain, and will sustain into the future, damages including:

   a)  extreme pain and suffering, both physical and mental;

   b)  bills and expenses for medical care and mental health counseling;

   c)  diminution in the ability and capacity to work, earn money, and perform household tasks; and

   d)  loss of enjoyment of life.

## Count III
## (Negligent Selection, Training, Supervision, and Retention)

196.    Plaintiffs incorporate all paragraphs of this Complaint as if fully set forth under this count and further allege as follows.

197.    In administering the affairs of BSA, BSA owed a duty to exercise reasonable care in the selection and/or approval, training, supervision, and retention of scoutmasters and scout leaders.

198.    As a matter of BSA policy and practice, adults seeking to participate in BSA's programs as scout leaders were required to submit applications to BSA or otherwise obtain BSA's approval.

199.    BSA's corporate bylaws have long stated that BSA would approve as leaders only those people it concluded possessed and demonstrated "the moral, educational, and emotional qualities deemed necessary for leadership."

200.    BSA had a duty, and assumed a duty, to use reasonable care in selecting, training, supervising and retaining adult leaders. Its duty was heightened because its programs gave adult leaders unsupervised access to minor children in vulnerable circumstances.

201.    Scoutmasters and scout leaders who were abusive or pedophilic were unfit to work with children, yet BSA's ranks were infested with such individuals.

202.    BSA breached its duties and failed to exercise reasonable care to: (a) adequately vet scout leaders before allowing them to participate in BSA programs; (b) train BSA scoutmasters and scout leaders for how to identify, respond to, and prevent child sex abuse, (c) supervise scoutmasters and scout leaders to make sure they met sufficient standards for the safety and protection of scouts; and (d) bar scout leaders from participating in BSA if they had a history of sexual abuse, either before or after their selection as adult leaders.

203.    BSA's breaches of duty caused Plaintiffs' injuries because they were substantial contributing causes of Plaintiffs' injuries and played a substantial part in bringing about harm to Plaintiffs.

204.    As a direct result and/or a reasonably probable consequence of BSA's breaches of duty, Plaintiffs have sustained in the past, continue to sustain, and will sustain into the future, damages including:

    a)   extreme pain and suffering, both physical and mental;

    b)   bills and expenses for medical care and mental health counseling;

    c)   diminution in the ability and capacity to work, earn money, and perform household tasks; and

    d)   loss of enjoyment of life.

### Count IV
### (Breach of Fiduciary Duty)

205.    Plaintiffs incorporate all paragraphs of this Complaint as if fully set forth under this count and further allege as follows.

206.    BSA owed a fiduciary duty to Plaintiffs.

207.    BSA's fiduciary duty arose out of the special relationship founded upon trust and confidence between BSA and Plaintiffs. BSA owed this same fiduciary duty to other scouts.

    a)   BSA actively promoted itself as providing a safe and wholesome environment and intended that scouts and their parents believe that this was true and that BSA could be entrusted with vulnerable children.

    b)   Plaintiffs and their parents trusted BSA to uphold values of morality, trustworthiness, kindness, and loyalty embodied in BSA's Reports to the Nation, the Scout Oath, and the Scout Law.

    c)   Plaintiffs and their parents trusted BSA as an institution that held itself out as having received, and indeed had received, special benefits and support from the federal government.

d) Plaintiffs and their parents trusted BSA such that they allowed BSA's scout leaders to take Plaintiffs, who were minor children, into the woods, on camping trips, and on overnight hikes—where, they knew, the BSA scout leaders would sleep in close quarters with Plaintiffs.

e) Some Plaintiffs and their parents trusted BSA such that they allowed BSA scout leaders to enter their homes or allowed Plaintiffs to visit and sleep over at BSA leaders' homes.

208. BSA's fiduciary duty also arose from the custodial relationship that BSA had with Plaintiffs, such as on camping trips and during other Scouting activities.

209. BSA scoutmasters and scout leaders not only were entrusted with the custody of children, but also were in positions of power and control with respect to Plaintiffs and other scouts, thereby providing a further source of the fiduciary duty.

210. BSA owed the highest duty to Plaintiffs to protect Plaintiffs and other scouts from adult predators in BSA's leadership ranks and to prevent them from being abused.

211. BSA owed the highest duty to Plaintiffs and other scouts to warn of the dangers of abuse in Scouting and to disclose the history of abuse and the known dangerous condition that existed within Scouting.

212. BSA owed the highest duty to Plaintiffs and other scouts not to misrepresent that Scouting was safe and wholesome, but instead to provide truthful information, including the disclosure of the long history of abuse in Scouting and the known increased risk of abuse in BSA programs.

213. BSA breached its fiduciary duty to Plaintiffs by serving its own self-interests to protect and promote its public image rather than giving Plaintiffs and their parents sufficient

information about the size and scope of its child sex abuse epidemic. By not disclosing this material information, BSA misled Plaintiffs, other scouts, and their parents.

214.    BSA breached its fiduciary duty to Plaintiffs by failing to protect or warn Plaintiffs or their parents of the dangers of abuse by pedophiles within Scouting.

215.    BSA breached its fiduciary duty to Plaintiffs by failing to safeguard and protect Plaintiffs from sexual predators within Scouting.

216.    BSA caused Plaintiffs' injuries because BSA's breaches of its fiduciary duty were substantial contributing causes of Plaintiffs' injuries and played a substantial part in bringing about the harms to Plaintiffs.

217.    As a direct result and/or a reasonably probable consequence of BSA's breaches of fiduciary duty, Plaintiffs have sustained in the past, continue to sustain, and will sustain into the future, damages including:

   a)  extreme pain and suffering, both physical and mental;

   b)  bills and expenses for medical care and mental health counseling;

   c)  diminution in the ability and capacity to work, earn money, and perform household tasks; and

   d)  loss of enjoyment of life.

**Count V**
**(Negligent Misrepresentations and Omissions)**

218.    Plaintiffs incorporate all paragraphs of this Complaint as if fully set forth under this count and further allege as follows.

219.    BSA has consistently misrepresented that its programs are safe and wholesome, and consistent with the highest moral and ethical values. These representations were false.

220.    BSA has consistently omitted material facts concerning the pedophiles in its ranks, history of abuse in Scouting, and the increased risk to scouts of being subjected to sexual abuse. BSA had a duty to make these disclosures because (1) they were necessary to make its affirmative statements not misleading, (2) BSA owed fiduciary duties to scouts, and (3) BSA owed heightened duties as a youth-serving organization.

221.    BSA made these material misrepresentations and omissions in annual "Reports to the Nation" that it delivered to Congress and in promotional materials published to burnish its image.   Paragraphs 72 to 77 allege specific examples of material misrepresentations and omissions that BSA had a duty to disclose.

222.    BSA's Reports to the Nation have consistently misrepresented that BSA is protecting scouts and upholding the values embodied in the Scout Oath and the Scout Law.

223.    BSA's Reports to the Nation—which BSA specifically encouraged and intended BSA representatives to disseminate and rely upon "to show why Scouting matters" and thereby increase public support, donations, and recruitment—have always omitted BSA's actual knowledge that its programs were especially susceptible to child sex abuse; that tens of thousands of pedophiles have participated in BSA activities; that BSA was actively concealing the identities of pedophilic scout masters and destroying files; and that hundreds of thousands of scouts had been sexually abused.

224.    BSA had and has a statutory duty to disclose these facts to Plaintiffs and the American public because they are material to the "activities of the corporation."

225.    These undisclosed facts are material because they bear on the safety and morality of a youth-serving organization that holds itself out as a bastion of safety and morality.

226. BSA further misrepresented its programs as being safe, wholesome, and values-based in its publications and other promotional material.

227. Plaintiffs (and/or their parents or guardians) reasonably relied on BSA's misrepresentations that BSA was a safe and a wholesome values-based organization. As a federally chartered corporation that received special benefits conferred by Congress, BSA had the imprimatur of the federal government's support and approval.

228. BSA's material misrepresentations and omissions caused harm to Plaintiffs. Plaintiffs joined BSA and, believing that they would be safe, unknowingly entrusted themselves to the custody and care of abusive BSA leaders.

229. BSA's material misrepresentations and omissions caused Plaintiffs' injuries because they were substantial contributing causes of Plaintiffs' injuries and played a substantial part in bringing about the harms to Plaintiffs.

230. As a direct result and/or a reasonably probable consequence of BSA's misrepresentations and omissions, Plaintiffs have sustained in the past, continue to sustain, and will sustain into the future, damages including:

    a) extreme pain and suffering, both physical and mental;

    b) bills and expenses for medical care and mental health counseling;

    c) diminution in the ability and capacity to work, earn money, and perform household tasks; and

    d) loss of enjoyment of life.

**Count VI**
**(Fraud and Fraudulent Misrepresentations and Omissions)**

231.   Plaintiffs incorporate all paragraphs of this Complaint (including the factual allegations supporting Count V) as if fully set forth under this count and further allege as follows.

232.   BSA knew that the misrepresentations in its Reports to the Nation and its promotional materials alleged herein were false.

233.   BSA knew that its omissions concerning the pedophiles in Scouting and its long history of abuse had to be disclosed to make its representations concerning the organization not misleading.

234.   Among other things, BSA knew nearly from its founding of the unique characteristics of its programs that rendered scouts particularly exposed to abuse by pedophiles. BSA knew from its I.V. files and other reports that scout leaders were sexually abusing children in alarming numbers. BSA knew that children would continue to suffer severe harm and damages from being sexually abused by its scout leaders. And BSA knew that reporting the true scope of its child sex abuse crisis would damage its public image (which in turn would reduce its enrollment numbers, damage its corporate sponsorships, and weaken its fundraising), as it withheld the existence of the I.V. files and the identities of the assailants, and spent years destroying files.

235.   BSA had an intent to deceive Plaintiffs into thinking BSA was a safe and wholesome values-based organization so that they would sign up and entrust themselves to the care of BSA leaders.

236.   BSA's intent is underscored by its destruction of files that would have revealed the true scope of its child sex abuse problem.

237.    Plaintiffs (and/or their parents or guardians) reasonably relied on BSA's misrepresentations that BSA was a safe and a wholesome values-based organization. As a federally chartered corporation that received special benefits conferred by Congress, BSA had the imprimatur of the federal government's support and approval.

238.    BSA caused Plaintiffs' injuries because BSA's fraudulent misrepresentations and omissions were substantial contributing causes of Plaintiffs' injuries and played a substantial part in bringing about the harms to Plaintiffs.

239.    As a direct result and/or a reasonably probable consequence of BSA's fraudulent misrepresentations and omissions, Plaintiffs have sustained in the past, continue to sustain, and will sustain into the future, damages including:

a)  extreme pain and suffering, both physical and mental;

b)  bills and expenses for medical care and mental health counseling;

c)  diminution in the ability and capacity to work, earn money, and perform household tasks; and

d)  loss of enjoyment of life.

### Count VII
### (Punitive Damages)

240.    Plaintiffs incorporate all paragraphs of this Complaint as if fully set forth under this count and further allege as follows.

241.    Plaintiffs are entitled to punitive damages against BSA.

242.    BSA acted with intent to injure, was recklessly indifferent, or acted in willful disregard for the rights of Plaintiffs and other scouts.

243.    BSA's conduct described in each of the above counts was egregious, outrageous, and/or reckless toward the safety of Plaintiffs and other scouts. Among other things:

41

a) BSA knew of the unique characteristics of its programs that rendered scouts particularly exposed to abuse by pedophiles.

b) BSA knew that scout leaders were sexually abusing children in startling numbers and knew that children would suffer severe harm and damages from being sexually abused by scout leaders.

c) BSA knew that its scout leaders, including its numerous pedophiles, would have unsupervised access to vulnerable children and would have opportunities to prey on children who put their trust in BSA.

d) Yet BSA continued to promote is programs as safe and wholesome, without taking appropriate steps to remedy the known dangerous condition of widespread child sexual abuse, and caused Plaintiffs and other scouts to sign up for and participate in BSA programs, and thus intentionally and/or recklessly exposed Plaintiffs to scout leaders and created opportunities for scout leaders to abuse Plaintiffs.

e) BSA, as part of its scheme, intentionally concealed its scout leaders' abuse and failed to take any steps to warn Plaintiffs and/or their parents that BSA scout leaders had sexually abused children and/or that it had been informed that BSA scout leaders had abused children.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court enter judgment against BSA and in Plaintiffs' favor for the following:

(a)     Special damages for medical treatment expenses, lost earnings, and lost earning capacity and the expenses of medication and other special expenses, both in the past and continuing into the future, in amounts to be determined at the time of trial;

(b)     All general damages; for physical, mental, and emotional injuries resulting from the acts and omissions of BSA alleged herein;

(c)     Attorney's fees, prejudgment interest, costs, and punitive damages as allowed by law; and

(d)     Such other relief as this Court may deem just and proper.

January 6, 2020                           Respectfully Submitted,

Carl S. Kravitz (DC Bar # 357376)
Caroline Judge Mehta (DC Bar # 471935)
Aitan D. Goelman (DC Bar # 446636)
Andrew N. Goldfarb (DC Bar # 455751)
Nicholas M. DiCarlo (DC Bar # 1033303)
Avery F. Pollard (DC Bar # 888324977)
ZUCKERMAN SPAEDER LLP
1800 M St. NW, Suite 1000
Washington, DC 20036
202-778-1800
ckravitz@zuckerman.com
cmehta@zuckerman.com
agoelman@zuckerman.com
agoldfarb@zuckerman.com
ndicarlo@zuckerman.com
apollard@zuckerman.com